**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| RSF PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-361-GKF-FHM |
| | ) | |
| SILVERMINE OPPORTUNITY | ) | |
| FUNDING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the court on the Motion to Dismiss of defendant Silvermine

Opportunity Funding, LLC ("Silvermine") for failure to state a claim upon which relief can be

granted.  [Dkt. # 13].

**I.      Legal Standard**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain

"only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  The plausibility requirement "does not impose a

probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence" of the conduct necessary to make out the claim.

*Id.* at 556.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Id.* at 555 (citations omitted).  The court "must determine whether the complaint

sufficiently alleges facts supporting all the elements necessary to establish an entitlement to

relief under the legal theory proposed."  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule does not require detailed factual allegations, but it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Naked assertions devoid of "further factual enhancement" do not suffice. *Id.*

## II.    RSF's Factual Allegations

Plaintiff RSF Partners, LLC ("RSF") alleges defendant Silvermine tortiously interfered with two contracts between RSF and Physicians Total Care, Inc. ("PTC"), and that Silvermine intentionally interfered with RSF's prospective economic advantage in its expectancy of a business relationship with PTC.

RSF alleges that, in December 2011, PTC "was actively seeking investors to fund PTC's operations and development of PTC's proprietary logistics management software that allows physicians to dispense medications directly from a doctor's office rather than through a retail pharmacy." [Dkt. # 2, ¶ 5]. On February 17, 2012, RSF and PTC entered into a "preliminary, non-binding letter agreement ('Letter Agreement') regarding the possible acquisition of, or controlling investment in, PTC." [*Id.* at ¶ 6]. In the Letter Agreement, RSF and PTC agreed to an "Exclusivity Period" until 5:00 PM Central Time on March 1, 2012 during which the parties were to continue to discuss on an exclusive basis the possible acquisition of, or controlling investment in, PTC. [Dkt. # 2, ¶ 7]. PTC agreed that it would not, directly or indirectly

> (i) [S]olicit, initiate, or take any action to facilitate or encourage any inquiries or the making of any proposal from a person or group of persons other than [RSF] and its affiliates that may constitute, or could reasonably be expected to lead to, an Alternative Transaction;[1]

---

[1] "Alternative Transaction" was defined as "any (i) direct or indirect acquisition of assets of [PTC] or any of its subsidiaries (including any voting equity interests of [PTC]'s subsidiaries) equal to 50% or more of the fair market value of [PTC]'s consolidated assets or to which 50% or more of [PTC]'s net revenues or net income on a consolidated basis are attributable, (ii) direct or indirect

(ii) [E]nter into or participate in any discussions or negotiations with any person or group of persons other than [RSF] and its affiliates regarding an Alternative Transaction;

(iii) [F]urnish any non-public information relating to [PTC] or any of its subsidiaries, assets or businesses, or afford access to the assets, business, properties, books or records of [PTC] or any of its subsidiaries to any person or group of persons other than [RSF] and its Representatives, in all cases for the purpose of assisting with or facilitating an Alternative Transaction; or

(iv) [E]nter into an Alternative Transaction or any agreement, arrangement or understanding, including, without limitation, any letter of intent, term sheet or other similar document, relating to an Alternative Transaction. Immediately upon execution of this letter, [PTC] shall, and shall cause its Representatives to[ ] terminate any and all existing discussions or negotiations with any person or group of persons other than [RSF] and its affiliates regarding an Alternative Transaction.

[Dkt. # 2-1, pp. 1-2].  PTC also agreed to promptly notify RSF of the receipt of "any oral or written offer, indication of interest, proposal or inquiry relating to an Alternative Transaction, such notice to include the material terms thereof, including the identity of the person or group of persons involved."  [*Id.* at p. 2].

On February 23, 2012, PTC executed a Secured Promissory Note whereby PTC promised to pay to RSF $25,000, plus interest at 10% *per annum* on or by March 1, 2012.  [Dkt. # 2, ¶ 11; Dkt. # 2-2, pp. 1-12].  On March 1, 2012, RSF and PTC agreed to extend both the Exclusivity Period and the maturity date and amount of the Secured Promissory Note from March 1 to March 13, 2012.  [Dkt. # 2, ¶ 12].  PTC executed an Amended and Restated Secured Promissory Note

---

acquisition of 50% or more of the voting equity interests of [PTC], (iii) tender offer or exchange offer that if consummated would result in any person beneficially owning 50% or more of the voting equity interests of [PTC], (iv) merger, consolidation, other business combination or similar transaction involving [PTC] or any of its subsidiaries, pursuant to which such person would own 50% or more of the consolidated assets, net revenues or net income of [PTC] and its subsidiaries, taken as a whole, or (v) liquidation or dissolution (or the adoption of a plan of liquidation or dissolution) of [PTC] or the declaration or payment of an extraordinary dividend (whether in cash or other property) by [PTC]; in all cases of clauses (i)-(iv) where such transaction is to be entered into with any person or group of persons other than [RSF] or its affiliates."  [*Id.* at p. 2].

whereby PTC promised to pay RSF $100,000, plus interest at 10% *per annum*, on or before March 13, 2012.  [Dkt. # 2, ¶ 12; Dkt. # 2-3, pp. 1-14].  On March 29, 2012, RSF and PTC agreed to extend both the Exclusivity Period and the maturity date of the Amended and Restated Secured Promissory Note from March 13 to May 31, 2012.  [Dkt. # 2, ¶ 13].  PTC executed an Amendment to the Amended and Restated Secured Promissory Note whereby PTC promised to pay RSF $205,000, plus interest at 10% *per annum* on or before May 31, 2012.  [*Id.*; Dkt. # 2-4, pp. 1-4].  Neither the Secured Promissory Note, Amended and Restated Secured Promissory Note, nor Amendment to the Amended and Restated Secured Promissory Note reference the Letter Agreement or any term of exclusivity.  [Dkt. # 2-2 – 2-4].

On March 31, 2012, RSF and PTC entered into a Common Stock Purchase Agreement. [Dkt. # 2, ¶ 14]. The purchase and sale of PTC's stock was to close on May 31, 2012.  [*Id.*].  RSF was to purchase 45,000,000 shares of PTC common for $45,000.00.  [Dkt. # 2-5, p. 2].   By its terms, once executed and delivered by PTC, the Common Stock Purchase Agreement constituted a "valid and legally binding obligation [ ] of [PTC]."  [*Id.* at p. 7].

In late April 2012, Barry Posner ("Posner") contacted PTC about purchasing an interest in PTC.  [Dkt. # 2, ¶ 15].  PTC never notified RSF about Posner's inquiry.  [*Id.*].  Without notifying RSF and in breach of the Letter Agreement, PTC and Posner entered into a nondisclosure agreement in April 2012.  [*Id.* at ¶ 16].  As a result of Posner's undisclosed interest in PTC, Posner brought in Silvermine as an equity partner in late May 2012.  [*Id.*].  PTC executed another secured promissory note, this time in favor of Silvermine, as consideration for purchasing an interest in PTC.  [*Id.* at ¶ 18].  Prior to May 31, 2012, PTC, in violation of its Letter Agreement, provided Silvermine a copy of the Common Stock Purchase Agreement, and its "financials, documents, performance data, pro formas, and other documents in order for

Silvermine to perform its own due diligence of PTC." [*Id*. at ¶ 19].  With knowledge of the Common Stock Purchase Agreement and Letter Agreement, Silvermine interfered with the contract between PTC and RSF.  [*Id*. at ¶ 20].  On May 31, 2012, as a direct result of Silvermine's actions, PTC advised RSF that it would not proceed with the closing on the Common Stock Purchase Agreement, advising RSF that the shareholders of PTC would not authorize the transaction.  [*Id*. at ¶ 21].  Silvermine purchased PTC's assets.[2]  [*Id*. at ¶ 22; Dkt. # 13-10].

### III.    RSF's Causes of Action: Tortious Interference with Contract and Intentional Interference with Prospective Economic Advantage

The elements of a cause of action for tortious interference (a.k.a. malicious interference) with contract are:  "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as a result of the interference."  *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1165 (Okla. 2009).  The element of malice is defined as "an unreasonable and wrongful act done intentionally, without just cause or excuse.  This element clearly requires a showing of bad faith."  *Id.*  The intentional interference must be "directed at the business relationship between [plaintiff] and some third party."  *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equip.*, 919 P.2d 443, 447 (Okla. Civ. App. 1994); *see also Ray v. Am. Nat. Bank & Trust Co. of Sapulpa*, 894 P.2d 1056, 1060 (Okla. 1994) ("A cause of action for wrongful interference with contract can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms.").

---

[2] The court may take judicial notice that, on October 31, 2012, the U.S. Bankruptcy Court for the Northern District of Oklahoma approved an Asset Purchase Agreement with Silvermine, and authorized the sale of substantially all of PTC's assets to Silvermine, free and clear of liens, claims, interests and encumbrances. *See In re: Physicians Total Care, Inc.*, Case No. 12-12502-M (Chapter 11) in the U.S. Bankruptcy Court for the Northern District of Oklahoma.

RSF also presses a common-law claim for intentional interference with prospective economic advantage.  In *Brock v. Thompson*, 948 P.2d 279, 293 n.58 (Okla. 1997), the Oklahoma Supreme Court noted "Oklahoma jurisprudence teaches that one has the right to prosecute a lawful business without unlawful molestation or unjustified interference from any person, and any malicious interference with that business is an unlawful act and an actionable wrong."  The tort is not recognized without malicious, intentional, or illegal conduct on the part of the defendant.  *Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 848-49 (Okla. Civ. App. 1984).

> [T]he tort began with 'malice', and it has remained very largely a matter of at least intent to interfere . . . cases have turned almost entirely upon defendant's motive or purpose, and the means by which he has sought to accomplish it.

*Id.*, (citing *Prosser on Torts*, § 130, at 952 (1971)) (internal quotations omitted).   The Restatement (Second) of Torts § 766B states that

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

In *Overbeck*, the court recognized that one must at least allege that the defendant engaged in an "improper means to 'lure'" the third party away.  757 P.2d at 849.

RSF argues "[i]t can reasonably be inferred from RSF's factual allegations in the Complaint that Silvermine had knowledge about the exclusivity contracts between RSF and PTC, and Silvermine intentionally, wrongfully, and maliciously interfered with those contracts." [Dkt. # 15, pp. 4-5].  RSF alleges in its Complaint that Silvermine, with knowledge of the Common Stock Purchase Agreement, Letter Agreement, and other documents, interfered with

6

RSF's contract.  [Dkt. # 2, ¶¶19, 20].  However, the Letter Agreement states the Exclusivity Period expired on March 1, 2012, at 5:00 p.m.  [Dkt. # 2-1, p. 1].  And neither the Common Stock Purchase Agreement nor the promissory notes mention a term of exclusivity.  Thus, RSF's argument that the court may reasonably infer from the Complaint that Silvermine was aware the exclusivity term extended beyond March 1, 2012, is not plausible.

In *Overbeck*, the Oklahoma Court of Civil Appeals recognized that "legitimate and fair competition is essential to our free enterprise system. . . .  legitimate competition, by fair means, is always lawful. . . ."  757 P.2d at 849 (internal citations omitted).

Upon review of the briefs and the applicable law, the Court concludes the Complaint fails to plausibly state the necessary element of malice and bad faith with respect to RSF's claim of tortious interference with contract.  With respect to the claim of intentional interference with prospective economic advantage, the Complaint fails to plausibly state that Silvermine's actions were malicious, intentional, illegal or otherwise improper.  Therefore, RSF has not pled a claim upon which relief can be granted.

The Court is unpersuaded at this juncture by Silvermine's argument that the Bankruptcy Court's Order approving the sale of PTC's assets to Silvermine would preclude a properly pled claim that a Silvermine maliciously interfered with a contract with PTC *before* PTC went into bankruptcy.

IV.	**Conclusion**

WHEREFORE, the Motion to Dismiss the Complaint [Dkt. # 13] is granted, without prejudice.  The court and the parties shall discuss plaintiff's deadline for filing an Amended Complaint at the upcoming status/scheduling conference.

IT IS SO ORDERED this 3rd day of February, 2014.


GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT